**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ODGERS BERNDTSON, LLC, <br><br> Plaintiff, <br><br> -against- <br><br> JAVIER O'NEIL and VALERIA ESCAMILLA, <br><br> Defendants. | Civil Action No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Odgers Berndtson, LLC ("Odgers") alleges for their Complaint against Defendants Javier O'Neil ("O'Neil") and Valeria Escamilla ("Escamilla"; collectively with O'Neil, "Defendants") the following:

## NATURE OF THE ACTION

1.     This action arises out of the misappropriation, disclosure, and use of Odgers' confidential information and trade secrets, in violation of O'Neil's and Valeria's contractual obligations, their duties of loyalty to Odgers, and the Defend Trade Secrets Acts of 2016 ("DTSA"). O'Neil and Escamilla have taken Odgers' confidential information and trade secrets to use the information on behalf, and for the benefit, of their current employer, Teneo, a competitor of Odgers.

2.     This involves a calculated and devious data theft by Defendants, former employees, who took great pains to design a scheme to steal information, conceal their involvement, and avoid detection.

3.     Between at least April 1 and April 15, 2021, O'Neil and Escamilla engaged in a scheme to cause a contractor of Odgers, Jacob P. Deutsch ("Deutsch"), to copy over 32,000 files (equaling over 1.3 terabytes of data) for them from Odgers' secure cloud storage on two locations and deliver the files to them personally on external drives. Defendants pretended that such copying

was for Odgers' legitimate business use and, as the requests came from two Odgers employees, it appeared Defendants requests were not nefarious.

4.     Defendants advised Deutsch that the systems Odgers utilized would not log his access or copying.  The files Defendants directed be copied included both search placement candidate and other information licensed by Odgers, and the underlying source code and files behind an application (the "OBDynamics™ Application") Odgers created through a contracted third party, Ugam Solutions ("Ugam"), which enabled direct client access to certain aspects of OBDynamics™, a new client-facing platform.  Both sets of files were highly confidential and well protected, requiring the use of special credentials to access the relevant server.  Indeed, Defendants provided Deutsch with Ugam's credentials so that it would appear that Ugam had accessed the files, deflecting any attention from the Defendants.

5.     The purpose of taking such files was to use them on behalf of Teneo to unfairly compete with Odgers.  Defendants communicated an express desire to replicate the OBDynamics™ Application outside of Odgers.  O'Neil described the misappropriated data as useful as a "baseline" for work at Teneo.

6.     Once O'Neil and Escamilla were certain the files—including updates made through April 15, 2021—had been twice downloaded and provided to them, they resigned.  On April 16, 2021, they provided Odgers with resignation e-mails.  Their employment with Odgers ended approximately one week later; shortly thereafter—and despite assuring Odgers they would not be entering a competitive space—they joined a competitor of Odgers, Teneo.

7.     The tens of thousands of files remain in Defendants' possession, on the drives Deutsch provided, during their employment at, and/or other relationship with, Teneo.

8.     Accordingly, as the Defendants have already joined a competitor and demonstrated their plan to use Odgers' confidential information and trade secrets to obtain a competitive

advantage, Odgers now seeks appropriate injunctive and monetary relief, including a temporary restraining order and a preliminary injunction to protect Odgers' confidential information and trade secrets while litigation proceeds.

## PARTIES

9.      Plaintiff Odgers Berndtson, LLC is a foreign limited liability company duly organized and existing under the laws of the State of Delaware, with a place of business at 2 Grand Central Tower, 140 East 45th Street, 44th Floor, New York, New York 10017.

10.     Defendant Javier O'Neil is a citizen of the State of New York and upon information and belief is a resident of the State of New York with a last-known address in this District.

11.     Defendant Valeria Escamilla is a citizen of the state of Texas and upon information and belief resides in Houston, Texas.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Odgers has asserted claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 against both Defendants.  This Court has supplemental or pendent jurisdiction over Odgers' remaining claims pursuant to 28 U.S.C. § 1367 because such claims form part of the same case or controversy under Article III of the United States Constitution.

13.     This Court has personal jurisdiction pursuant to CPLR §§ 301 and 302(a) in that O'Neil resides in New York; Defendants transact business within New York; and either committed a tortious act within the state, or committed a tortious act outside of the state that has caused injury to Odgers within the state and (a) regularly did or solicited business in the State of New York and/or (b) expected or should reasonably have expected the tortious acts to have consequences in the State of New York and derives substantial revenue from interstate or international commerce.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or acts giving rise to the claim occurred in this Judicial District and because O'Neil resides in this District.

**STATEMENT OF FACTS**

15.     Odgers provides executive searches, board searches, executive coaching and development services, industry mapping, interim appointments, leadership assessment services and other related services.

16.     Odgers provides certain of these services using candidate identification technology which Odgers is involved in.

Odgers Employs O'Neil and Escamilla

17.     On or about February 15, 2019, O'Neil signed and entered into an offer letter with Odgers ("O'Neil Agreement"). Attached hereto as Exhibit 1 is a true and correct copy of the O'Neil Agreement. O'Neil was hired as the Head of Research and Knowledge Management in Odgers' New York office, where he was "expected to manage the research needs of the Company" which involved searching for candidates using Odgers' technology and records.

18.     The O'Neil Agreement contained, inter alia, a section where O'Neil agreed not to "directly or indirectly divulge, disclose, or communicate to any person, firm or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of [Odgers]" including "any other information concerning the business of employer, its manner of operation, or its plans, processes, or other date of any kind, nature, or description without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important."

19.     On or about September 5, 2018, Escamilla signed and entered into an offer letter with Odgers ("Escamilla Agreement"). Attached hereto as Exhibit 2 is a true and correct copy of

the Escamilla Agreement. Escamilla was hired as a Research Associate in Odgers' Houston office, where she was "expected to support the research needs and candidate development responsibilities on select assignments." Escamilla eventually transitioned to a role involving the use of technology to manage the research needs of Odgers.

20.     The Escamilla Agreement, like the O'Neil Agreement, contained a section where Escamilla agreed not to "directly or indirectly divulge, disclose, or communicate to any person, firm or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of [Odgers]" including "any other information concerning the business of employer, its manner of operation, or its plans, processes, or other date of any kind, nature, or description without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important."

21.     O'Neil and Escamilla's work included involvement with the launch of Odgers' OBDynamics™ system which involved the use of large amounts of data to identify individuals.

22.     The first use of this capacity was when Odgers, together with the United States Civilian Corps, lead a national response to the COVID-19 crisis. Odgers Berndtson combined its AI-powered talent search platform with a volunteer-led project management capability to rapidly identify healthcare professionals nationwide so that they could be deployed by governments to where they were needed most.

23.     The OBDynamics™ system is designed to enable Odgers to (1) build custom analytical maps of skills and talent distributions, compensation variation, career progressions, and pipeline analyses; (2) provide tailored shortlists of ready-to-hire and mid-level candidates to Odgers' clients; and (3) execute traditional executive searches faster, more accurately, with a more diverse population of candidates, and with a greater chance of finding candidates.

24.     On or about February 17, 2020, O'Neil and Escamilla each signed and entered into a Reminder and Acknowledgement of Confidentiality Obligations (the "O'Neil Confidentiality Agreement" and "Escamilla Confidentiality Agreement", respectively).  Attached hereto as Exhibits 3 and 4 respectively are true and correct copies of the O'Neil Confidentiality Agreement and Escamilla Confidentiality Agreement.

25.     Through the Confidentiality Agreements, both O'Neil and Escamilla reaffirmed their existing confidentiality obligations found in their offer letters.  Located immediately before their names and signatures was a passage, in capital letters, stating "YOUR SIGNATURE BELOW CONFIRMS YOUR RECEIPT OF AND ACKNOWLEDGEMENT OF YOUR EXISTING CONFIDENTIALITY OBLIGATIONS AND THOSE CONTAINED HEREIN."

26.     Furthermore, O'Neil and Escamilla specifically agreed that information concerning the new, AI-enabled platform would be treated "as both Confidential Information and Trade Secrets" and that they would "take special care not to discuss this initiative nor any of its aspects or particulars including the name of our software/AI partner outside of Odgers generally and specifically with any other executive search firms."  One such initiative was Odgers creation of the OBDynamics™ Application.

27.     On April 16, 2021, both O'Neil and Escamilla sent resignation letters to Odgers via electronic mail.

28.     O'Neil and Escamilla worked for Odgers for approximately a week after their resignations were submitted.  Each made representations to Odgers during this period that they were leaving to become independent contractors and would not be working in a competitive space.

29.     O'Neil and Escamilla returned their Odgers laptops to Odgers at or around their resignations.  They turned over no other hardware or files.

30. Shortly after leaving Odgers, both O'Neil and Escamilla joined Teneo working in a competitive capacity.[1] Their earlier statements regarding not working in a competitive space were intentionally misleading.

O'Neil and Escamilla's Covert Misappropriation Scheme

31. Behind the scenes of this sudden resignation, over their final two weeks before submitting their resignations to Odgers, O'Neil and Escamilla orchestrated a daring misappropriation of tens-of-thousands of files comprising Odgers' confidential information and trade secrets.

32. On or about April 1, 2021, on behalf of himself and Escamilla, O'Neil asked Jacob P. Deutsch ("Deutsch"), a then-provider of services to Odgers on a project-by-project basis, to "discreetly" download tens of thousands of files to a drive for him.

33. O'Neil had Deutsch's company sign a non-disclosure agreement with Odgers. O'Neil and Escamilla hid the fact that Deutsch was performing work for them under the guise that it was for Odgers.

34. O'Neil and Escamilla gave and intended to give the impression to Deutsch that the request was coming from Odgers.

35. For several months, O'Neil groomed Deutsch in order to deceive him. O'Neil led Deutsch to believe that Odgers would be hiring his company to a long-term contract for significantly more money than Deutsch was earning on a project-by-project basis.

---

[1] Another Odgers partner, Sally Drexler, also joined Teneo around this same time period and Ms. Drexler's executive assistant also recently joined Teneo. Upon information and belief, there were communications between O'Neil and Ms. Drexler in the lead up to their decisions to join Teneo; however, Odgers presently has no information directly connecting Ms. Drexler, or her executive assistant, to the misappropriation of confidential information and trade secrets outlined herein.

36.     There was no legitimate business purpose for such a download by Deutsch on behalf of Defendants at that time nor of those particular documents nor any need to do it discreetly.

37.     On or about April 5, 2021, O'Neil and Escamilla established a group message on Signal, an encrypted messaging application, where Escamilla provided login credentials and a password to Deutsch to access the Odgers' servers and download the requested files.

38.     O'Neil and Escamilla gave Deutsch the login credentials and password for Ugam, the developer working with Odgers on the OBDynamics™ Application.

39.     Upon information and belief, by using Ugam's credentials, O'Neil and Escamilla sought to conceal their unauthorized download instructions by making it appear a developer with a legitimate basis to access such files had done so.

40.     Deutsch was also informed that the IP Address logging processes would not be active in the areas he needed to access to conduct the download.  This too was designed to conceal the actions requested of Deutsch as, if this log were off, Odgers would not be able to determine that anyone copied their information let alone who did it and if they were associated with the Defendants.

41.     Those logging functions were indeed off when Deutsch accessed Odgers' systems.

42.     On April 6, 2021, Deutsch confirmed to O'Neil and Escamilla that he had downloaded files totaling over 1.3 terabytes of information to an external drive.

43.     The same date, Escamilla asked if there would be "any use in extracting anything" from a connected "instance".  She explicitly explained their motivation in downloading the OBDynamics™ Application files and their asking about the instance as "want[ing the files necessary] to replicate this app in a separate environment".

44.     "Replicat[ing] this app in a separate environment" means to recreate the OBDynamics™ Application outside of Odgers and Odgers' servers, such as on behalf of Teneo.

45.     In response, Deutsch said the active instance of the OBDynamics™ Application would need to be taken offline to permit the backup.  O'Neil and Escamilla asked if there would be evidence in the server log that the instance was taken offline.  When Deutsch confirmed there would be evidence, O'Neil and Escamilla ended the request, stating that they could "just recreate a similar instance."

46.     On April 8, 2021, O'Neil asked Deutsch how the download went and confirmed that Deutsch should hand deliver the drives (two copies of the information downloaded) to O'Neil at his house on April 11, 2021.

47.     At or around this time, per O'Neil and Escamilla's instructions, Deutsch copied the downloaded files onto two SATA external drives.  Deutsch created and kept a separate external drive containing a copy of the same files.

48.     On April 11, 2021, Deutsch met with O'Neil at O'Neil's house and gave him the two SATA external drives.  O'Neil had indicated that one drive was for Escamilla.

49.     On April 15, 2021, Escamilla contacted Deutsch to inform him that updates had been released for certain of the files he had been asked to copy.  She asked him to log back on using the same credentials and make sure he "backed up the latest version" for O'Neil and Escamilla.

50.     After receiving Escamilla's requests, Deutsch accessed Odgers' servers, downloaded the updated files, and provided them to O'Neil and Escamilla by Dropbox.

51.     The <u>next</u> day after receiving the updated files, O'Neil and Escamilla submitted their resignations and worked for just approximately one more week at Odgers.

52.     Despite claiming to need these downloads under Odgers' authority, O'Neil and Escamilla had no legitimate business purpose for any of the above requests.  Neither ever returned the external drives not the files they had worked so hard to hide that they were misappropriating.

53.     O'Neil and Escamilla's deception of Deutsch continued beyond their resignations. On April 22, 2021, Deutsch reached out to O'Neil to ask him about the contract proposal he had made earlier to work with Idenx, a wholly owned subsidiary of Odgers.  Although O'Neil (and Escamilla) had submitted his resignation to Odgers nearly a week earlier, on April 16, O'Neil did not reveal this to Deutsch at that time.  Instead, he pretended he was still working for, and in good standing with, Odgers and that the delay was administrative because of an "internal power struggle" that he hoped would be resolved shortly.

54.     O'Neil eventually disclosed to Deutsch that he had left to join Teneo.  At some point in late April or later, O'Neil indicated to Deutsch that the misappropriated files would be used by O'Neil and Escamilla as a "baseline" for competitive work at Teneo.

55.     On June 25, 2021, Deutsch turned over to Odgers his external hard drive copy of the information downloaded on behalf of O'Neil and Escamilla.

**Odgers' Treatment of Confidential Information and Trade Secrets**

56.     Odgers maintains confidential information and trade secrets that derive their economic value in part from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, such as Odgers' competitors, like Teneo.

57.     The over 1.3 terabytes of data sets copied by O'Neil and Escamilla contain information that is compiled and combined by Odgers to provide Odgers a unique data set, unavailable to the public at large.

58.     The data sets O'Neil and Escamilla copied are also required by Odgers to be kept confidential pursuant to license agreements it enters into.

59.     If this information were publicly disclosed, Odgers' would be placed at a competitive disadvantage and incur a significant amount of damages.

60. The OBDynamics™ Application files copied by O'Neil and Escamilla include the OBDynamics™ Application's code and constituent files needed to recreate the OBDynamics™ Application. Public disclosure of these files would allow any of Odgers' competitors, such as Teneo, to create a competitive product.

61. Odgers takes significant steps to ensure that its confidential information and trade secrets are protected from unauthorized access and/or disclosure. As seen with O'Neil's and Escamilla's agreements, Odgers includes confidentiality provisions in its employee agreements.

62. Odgers' employee handbook contains multiple sections dealing with treatment of Odgers' information and confidential materials. Odgers states in the handbook that:

> Information relating to the business of Odgers Berndtson LLC and its clients and customers, regardless of the source, is considered confidential and may not be disclose to any person other than those within Odgers Berndtson LLC who have a legitimate need to know. Be careful not to discuss office matters outside the office, even if names are not used. In particular, Odgers Berndtson LLC matters should not be discussed in elevators, restaurants or other public places where you can be heard.

63. With regard to work product, the handbook states that "any appropriation of Odgers Berndtson LLC computer files . . . without proper authorization may result in immediate termination and appropriate legal action."

64. Odgers' computer systems are password-protected—with dual authentication—to limit access to those with permission to do so. In particular, the systems from which the documents were downloaded are themselves accessible only through the use of credentials generated by Odgers, and few people have permissions to generate such credentials. The specific portion of Odgers' servers that O'Neil and Escamilla asked Deutsch to "backup"—AWS S3—is similarly password protected.

65. Odgers has contractual obligations to keep the information it licenses confidential and has contractual liability for actions by O'Neil and Escamilla, despite the fact that it was theft and outside of their control.

66. O'Neil and Escamilla have taken these files and maintained them during their employment with Teneo so that Teneo has access to such information through both O'Neil and Escamilla.

67. O'Neil has communicated his intent to use these files as a "baseline" at Teneo.

68. Escamilla expressed a desire or intent to "replicate" the OBDynamics™ Application outside of Odgers which, upon information and belief, means on behalf of Teneo.

69. Their urgent download of all of these files in their final two weeks with Odgers—including downloading updated files just one day before their resignation—can only be explained by an intent to use these files in the manner they have stated. Had Defendants not intended to use the information, they would have consulted with others at Odgers before downloading and left the files with others at Odgers upon their departures.

70. Odgers has suffered and will suffer irreparable harm as a result of the taking and use of Odgers' confidential information and trade secrets.

71. As licensee of data amounting to trade secrets, Odgers is permitted to and compelled to seek data which has been stolen from it.

## COUNT I
## BREACH OF DUTY OF
## <u>LOYALTY/FAITHLESS SERVANT</u>
(Against O'Neil)

72. Odgers repeats, restates and realleges the allegations in paragraphs 1 through 71 above, as if fully set forth herein.

73.     During O'Neil's employment at Odgers, he owed certain common law duties to it, including, but not limited to, duties of loyalty and fidelity.

74.     O'Neil was prohibited from acting in a disloyal manner and is required at all times to act in accordance with the best interests of and primarily for the benefit of his employer, Odgers.

75.     The duties of loyalty and fidelity required, among other things, that O'Neil refrain from taking Odgers' confidential information and trade secrets including to use such information to unfairly compete with Odgers.

76.     O'Neil breached his duties of loyalty and fidelity by, *inter alia*:

a.     Causing the download of Odgers' confidential information and trade secrets from Odgers' servers with no legitimate business purpose for doing so and for the stated purpose of using the information for Teneo;

b.     Orchestrating a theft of data by obtaining through false pretenses two physical hard drives and one Dropbox transfer comprising copies of confidential information and trade secrets downloaded from Odgers' systems; and

c.     Taking and/or failing to return Odgers' confidential information and/or trade secrets upon his departure from Odgers.

77.     The aforementioned conduct constitutes a breach of O'Neil's common-law duties of loyalty and fidelity to Odgers and render him a "faithless servant" within the meaning of the law.

78.     During his employment, O'Neil received compensation from Odgers at times when he was in violation of his duties of loyalty and fidelity to his employer including those times in which he was orchestrating the theft and misappropriation of Odgers' confidential information and trade secrets.

79.     O'Neil's disloyalty to Odgers permeated his employment in substantial part.

80.     O'Neil's disloyalty has irreparably harmed Odgers in (a) that the taking and/or use of its confidential information and trade secrets for use for Teneo in competition with Odgers harms Odgers; (b) the theft of data from Odgers harms its ability to obtain rights to data and (c) convincing client and candidates to deal with Odgers will be made more difficult as each relies on discretion and confidentiality.

81.     O'Neil must disgorge all compensation earned during his period(s) of disloyalty as well as pay Odgers compensatory damages.

82.     O'Neil's actions have and will cause future economic harm to Odgers.

83.     O'Neil's actions were and are extreme and outrageous, and have been undertaken maliciously, deliberately, and with the willful intent to cause harm to Odgers.

84.     As a result of the foregoing, Odgers has suffered damages in an amount not yet known to Odgers, but in excess of the jurisdictional minimum of this Court and to be determined at trial.  Odgers is also entitled to punitive damages in an amount to be determined at trial.

**COUNT II**
**BREACH OF DUTY OF**
**LOYALTY/FAITHLESS SERVANT**
(Against Escamilla)

85.     Odgers repeats, restates and realleges the allegations in paragraphs 1 through 84 above, as if fully set forth herein.

86.     During Escamilla's employment at Odgers, she owed certain common law duties to it, including, but not limited to, duties of loyalty and fidelity.

87.     Escamilla was prohibited from acting in a disloyal manner and is required at all times to act in accordance with the best interests of and primarily for the benefit of her employer, Odgers.

88. The duties of loyalty and fidelity required, among other things, that Escamilla refrain from taking Odgers' confidential information and trade secrets including to use such information to unfairly compete with Odgers.

89. Escamilla breached her duties of loyalty and fidelity by, *inter alia*:

    a. Causing the download of Odgers' confidential information and trade secrets from Odgers' servers with no legitimate business purpose for doing so and for the express purpose of using the information outside of Odgers data environment and therefore during employment with Teneo;

    b. Orchestrating a theft of data by obtaining through false pretenses at least a physical hard drive and one Dropbox transfer copies comprising confidential information and trade secrets downloaded from Odgers' systems;

    c. Coordinating a second download of Odgers' confidential information and trade secrets specifically for the purpose of being able to ensure that O'Neil and Escamilla had the most up-to-date version of the data taken from Odgers before submitting her resignation to Odgers; and

    d. Taking and/or failing to return Odgers' confidential information and/or trade secrets upon her departure from Odgers.

90. The aforementioned conduct constitutes a breach of Escamilla's common-law duties of loyalty and fidelity to Odgers and render her a "faithless servant" within the meaning of the law.

91. During her employment, Escamilla received compensation from Odgers at times when she was in violation of her duties of loyalty and fidelity to her employer including those times in which she was orchestrating the download and misappropriation of Odgers' confidential information and trade secrets.

92.     Escamilla's disloyalty to Odgers permeated her employment in substantial part.

93.     Escamilla's disloyalty has irreparably harmed Odgers in (a) that the taking and/or use of its confidential information and trade secrets for use for Teneo in competition with Odgers harms Odgers; (b) the theft of data from Odgers harms its ability to obtain rights to data and (c) convincing client and candidates to deal with Odgers will be made more difficult as each relies on discretion and confidentiality.

94.     Escamilla must disgorge all compensation earned during her period(s) of disloyalty as well as pay Odgers compensatory damages.

95.     Escamilla's actions have and will cause future economic harm to Odgers.

96.     Escamilla's actions were and are extreme and outrageous, and have been undertaken maliciously, deliberately, and with the willful intent to cause harm to Odgers.

97.     As a result of the foregoing, Odgers has suffered damages in an amount not yet known to Odgers, but in excess of the jurisdictional minimum of this Court and to be determined at trial.  Odgers is also entitled to punitive damages in an amount to be determined at trial.

## COUNT III
## BREACHES OF CONTRACTS
(Against O'Neil)

98.     Odgers repeats, restates and realleges the allegations in paragraphs 1 through 97 above, as if fully set forth herein.

99.     The O'Neil Agreement constitutes a valid and binding contract between Odgers and O'Neil.

100.    Odgers has performed all of its material obligations under the O'Neil Agreement.

101.    The O'Neil Confidentiality Agreement constitutes a valid and binding contract between Odgers and O'Neil.

102.    Odgers has performed all of its material obligations under the O'Neil Confidentiality Agreement.

103.    O'Neil has breached his obligations in the O'Neil Agreement and O'Neil Confidentiality Agreement by taking, not returning, and divulging and disclosing Odgers' confidential information and trade secrets, including by subsequently taking that information to Teneo, a competitor of Odgers.

104.    O'Neil was obligated to return all of Odgers' confidential information and trade secrets to Odgers upon the end of his employment. O'Neil failed to do so.

105.    Odgers subsequently demanded the return of its confidential information and/or trade secrets from O'Neil, with which request O'Neil failed to comply.

106.    Odgers took efforts to keep its confidential information and trade secrets confidential including password protecting its computers, password protecting its software systems and requiring its employees to sign agreements concerning the protection of confidential information and trade secrets.

107.    Odgers has been harmed by O'Neil's actions to date.

108.    Odgers has and will continue to sustain irreparable harm as a consequence of this breach, including the loss of the exclusive use of the OBDynamics™ Application, the ability of O'Neil and Teneo to use Odgers' confidential information and trade secrets for Teneo and in competition with Odgers, and the theft of data from Odgers, which harms its ability to obtain rights to data and to convince clients and candidates to deal with Odgers, as each relies on discretion and confidentiality.

109.    In the absence of injunctive relief, Odgers will continue to sustain losses, which are unascertainable at this time, and future economic losses, which are presently incalculable.

110. A preliminary and permanent injunction are, therefore, necessary to maintain the status quo ante and to prevent further irreparable harm.

111. Odgers has no adequate remedy at law.

112. As a result of the foregoing, Odgers has and will suffered irreparable harm and damages in an amount not yet known to Odgers, but in excess of the jurisdictional minimum of this Court and to be determined at trial.

## COUNT IV
## BREACHES OF CONTRACTS
### (Against Escamilla)

113. Odgers repeats, restates and realleges the allegations in paragraphs 1 through 112 above, as if fully set forth herein.

114. The Escamilla Agreement constitutes a valid and binding contract between Odgers and Escamilla.

115. Odgers has performed all of its material obligations under the Escamilla Agreement.

116. The Escamilla Confidentiality Agreement constitutes a valid and binding contract between Odgers and Escamilla.

117. Odgers has performed all of its material obligations under the Escamilla Confidentiality Agreement.

118. Escamilla has breached her obligations in the Escamilla Agreement and Escamilla Confidentiality Agreement by taking, not returning, and divulging and disclosing Odgers' confidential information and trade secrets, including by subsequently taking that information to Teneo, a competitor of Odgers.

119. Escamilla was obligated to return all of Odgers' confidential information and trade secrets to Odgers upon the end of her employment. Escamilla failed to do so.

120.    Odgers subsequently demanded the return of its confidential information and/or trade secrets from Escamilla, with which request Escamilla failed to comply.

121.    Odgers took efforts to keep its confidential information and trade secrets confidential including password protecting its computers, password protecting its software systems and requiring its employees to sign agreements concerning the protection of confidential information and trade secrets.

122.    Odgers has been harmed by Escamilla's actions to date.

123.    Odgers has and will continue to sustain irreparable harm as a consequence of this breach, including the loss of the exclusive use of the OBDynamics™ Application, the ability of Escamilla and Teneo to use Odgers' confidential information and trade secrets for Teneo and in competition with Odgers, and the theft of data from Odgers, which harms its ability to obtain rights to data and to convince clients and candidates to deal with Odgers, as each relies on discretion and confidentiality.

124.    In the absence of injunctive relief, Odgers will continue to sustain losses, which are unascertainable at this time, and future economic losses, which are presently incalculable.

125.    A preliminary and permanent injunction are, therefore, necessary to maintain the status quo ante and to prevent further irreparable harm.

126.    Odgers has no adequate remedy at law.

127.    As a result of the foregoing, Odgers has and will suffered irreparable harm and damages in an amount not yet known to Odgers, but in excess of the jurisdictional minimum of this Court and to be determined at trial.

## COUNT V
## VIOLATION OF THE DEFEND TRADE SECRETS
## ACT OF 2016 (18 U.S.C. §§ 1836, et seq.)
(Against O'Neil)

128.    Odgers repeats, restates and realleges the allegations in paragraphs 1 through 127 above, as if fully set forth herein.

129.    Odgers possesses valuable trade secrets, whose economic value in part derives from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, such as Odgers' competitors, like Teneo.

130.    O'Neil caused the download of multiple categories of trade secrets, including both (1) a compilation of personal data files enabling Odgers to create a unique data environment to provide its unique search capabilities to its clients, and (2) source code and underlying files for the OBDynamics™ Application developed by Odgers with Ugam to provide its clients with an interface with Odgers' OBDynamics™ platform.

131.    Odgers spent significant amounts of money to have a third-party program and build it a client interface with Odgers' OBDynamics™ platform.  The compilation of data files and the was obtained by Odgers through the  substantial expenditures of hundreds of thousands of dollars.

132.    Odgers takes significant steps to ensure that its trade secrets are protected from unauthorized access and/or disclosure.  The information is not readily ascertainable by anyone not employed at Odgers, and, in fact, is limited to small portion of those employed by Odgers.  Odgers includes provisions governing treatment of trade secrets in their employee agreements, includes sections in its employee manual emphasizing how such information must be treated, and utilizes passwords and credentials to limit access to those with permission to do so.

133.     The trade secrets O'Neil caused to be downloaded, copied, and provided to him derive independent economic value from not being generally known to Odgers' competitors, such as Teneo, and is not readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

134.     The trade secrets O'Neil caused to be downloaded, copied, and provided to him constitute trade secrets under New York law as well as under the DTSA.

135.     At the time of the download and misappropriation, O'Neil had knowledge of the secret nature of Odgers' trade secrets under circumstances that give rise to a duty to maintain their secrecy and limit their use.  He also knew that the information is highly valuable, unique, and considered to be trade secrets.

136.     O'Neil was provided with notice of a certain limited immunity pursuant to the DTSA.

137.     Upon information and belief, O'Neil retained the trade secrets after resignation from Odgers, to disclose them to Teneo and/or to use them while employed at Teneo and therefore for his and Teneo's benefit.  For example, he stated to Deutsch that the information taken would form a "baseline" for his work at Teneo.

138.     O'Neil therefore has misappropriated Odgers' trade secrets as prohibited by the DTSA.

139.     O'Neil's misappropriation of Odgers' trade secrets has been willful and malicious, and designed to aid Odgers' direct competitor.

140.     As a result of the foregoing, Odgers has and will suffer damages in an amount not yet known to Odgers, but in excess of the jurisdictional minimum of this Court and to be determined at trial.  Odgers is also entitled to recover exemplary damages in an amount not more

than two times the amount of damages awarded as compensatory damages and reasonable attorneys' fees.

### COUNT VI
### VIOLATION OF THE DEFEND TRADE SECRETS
### ACT OF 2016 (18 U.S.C. §§ 1836, et seq.)
(Against Escamilla)

141.    Odgers repeats, restates and realleges the allegations in paragraphs 1 through 140 above, as if fully set forth herein.

142.    Odgers possesses valuable trade secrets, whose economic value in part derives from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, such as Odgers' competitors, like Teneo.

143.    Escamilla caused the download of multiple categories of trade secrets, including both (1) a compilation of personal data files enabling Odgers to create a unique data environment to provide its unique search capabilities to its clients, and (2) source code and underlying files for the OBDynamics™ Application developed by Odgers with Ugam to provide its clients with an interface with Odgers' OBDynamics™ platform.

144.    Odgers spent significant amounts of money to have a third-party program and build it a client interface with Odgers' OBDynamics™ platform.

145.    The compilation of data files was obtained by Odgers through the substantial expenditures of hundreds of thousands of dollars.

146.    Odgers takes significant steps to ensure that its trade secrets are protected from unauthorized access and/or disclosure. The information is not readily ascertainable by anyone not employed at Odgers, and, in fact, is limited to small portion of those employed by Odgers. Odgers includes provisions governing treatment of trade secrets in their employee agreements, includes

sections in its employee manual emphasizing how such information must be treated, and utilizes passwords and credentials to limit access to those with permission to do so.

147.    The trade secrets Escamilla caused to be downloaded, copied, and provided to her derive independent economic value from not being generally known to Odgers' competitors, such as Teneo, and is not readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

148.    The trade secrets Escamilla caused to be downloaded, copied, and provided to her constitute trade secrets under New York law as well as under the DTSA.

149.    At the time of the download and misappropriation, Escamilla had knowledge of the secret nature of Odgers' trade secrets under circumstances that give rise to a duty to maintain their secrecy and limit their use.  She also knew that the information is highly valuable, unique, and considered to be trade secrets.

150.    Escamilla was provided with notice of a certain limited immunity pursuant to the DTSA.

151.    Upon information and belief, Escamilla retained the trade secrets after resignation from Odgers, to disclose them to Teneo and/or to use them while employed at Teneo and therefore for her and Teneo's benefit.  For example, she told Deutsch that she wanted all the OBDynamics™ Application files needed to replicate the OBDynamics™ Application in a separate environment.

152.    Escamilla therefore has misappropriated Odgers' trade secrets as prohibited by the DTSA.

153.    Escamilla's misappropriation of Odgers' trade secrets has been willful and malicious, and designed to aid Odgers' direct competitor.

154.    As a result of the foregoing, Odgers has and will suffer damages in an amount not yet known to Odgers, but in excess of the jurisdictional minimum of this Court and to be

determined at trial. Odgers is also entitled to recovery exemplary damages in an amount not more than two times the amount of damages awarded as compensatory damages and reasonable attorneys' fees.

**COUNT VII**
**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS UNDER NEW YORK LAW**
(Against O'Neil)

155.     Odgers repeats, restates and realleges the allegations in paragraphs 1 through 154 above, as if fully set forth herein.

156.     Odgers has attempted to prevent disclosure of its confidential and proprietary information and trade secrets.

157.     The confidential information and trade secrets derive potential and actual value from not being generally known to others who can obtain economic value from their disclosure, including through use by an entity competing with Odgers, like Teneo.

158.     O'Neil has knowingly and willfully misappropriated, and, upon information and belief, is exploiting for his own economic advantage and the economic advantage of his current employer, Teneo, a competitor of Odgers, confidential and proprietary information of Odgers, including but not limited to a compilation of data files and the source code and underlying files of the OBDynamics™ Application which O'Neil gained access to solely through his position at Odgers.

159.     O'Neil has already or inevitably will use and/or disclose this misappropriated information to Teneo, his new employer. O'Neil has already expressed his desire to use the misappropriated information as a "baseline" at Teneo and, with Escamilla, his plan to "recreate" the OBDynamics™ Application.

160.    As a direct result of O'Neil's wrongdoing, Odgers has been damaged in an amount to be determined at trial.

161.    O'Neil's actions were committed knowingly, willfully, and in conscious disregard of Odgers' rights.  Accordingly, Odgers is entitled to recover punitive damages in an amount to be determined at trial.

## COUNT VIII
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS UNDER NEW YORK LAW
(Against Escamilla)

162.    Odgers repeats, restates and realleges the allegations in paragraphs 1 through 161 above, as if fully set forth herein.

163.    Odgers has attempted to prevent disclosure of its confidential and proprietary information and trade secrets.

164.    The confidential information and trade secrets derive potential and actual value from not being generally known to others who can obtain economic value from their disclosure, including through use by an entity competing with Odgers, like Teneo.

165.    Escamilla has knowingly and willfully misappropriated, and, upon information and belief, is exploiting for her own economic advantage and the economic advantage of her current employer, Teneo, a competitor of Odgers, confidential and proprietary information of Odgers, including but not limited to a compilation of data files and the source code and underlying files of the OBDynamics™ Application which Escamilla gained access to solely through her position at Odgers.

166.    Escamilla has already or inevitably will disclose this misappropriated information to Teneo, her new employer.  Escamilla has already referenced a plan to "recreate" the

OBDynamics™ Application outside of Odgers' server, which would only make sense as a plan on behalf of a competing entity, like Teneo.

167.    As a direct result of Escamilla's wrongdoing, Odgers has been damaged in an amount to be determined at trial.

168.    Escamilla's actions were committed knowingly, willfully, and in conscious disregard of Odgers' rights.  Accordingly, Odgers is entitled to recover punitive damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Odgers hereby demands a trial by a Jury on all issues triable by right of Jury.

**WHEREFORE**, Plaintiff Odgers prays:

A.    A temporary restraining order, preliminary injunction, and permanent injunction prohibiting O'Neil and Escamilla, directly and indirectly, and all those working in concert with them, from possessing, disclosing, and/or using Odgers' trade secrets and confidential information, which is defined as information and/or documents obtained during O'Neil's and/or Escamilla's employment with Odgers and falls under the terms of the O'Neil Confidentiality Agreement and Escamilla Confidentiality Agreement, including but not limited to information Odgers licensed from third parties and the files alleged to have been taken and copied onto the external drives or for which Dropbox downloads were created as detailed herewith;

B.    A temporary restraining order, preliminary injunction, and permanent injunction ordering O'Neil and Escamilla, directly and indirectly, and all those working in concert with them, to return to Odgers' counsel any and all hard or electronic copies

of such trade secrets and confidential information, including those external drives given to O'Neil by Deutsch or for which Dropbox downloads were created by Deutsch for Defendants and any copies or information derived therefrom;

C. A temporary restraining order ordering O'Neil and Escamilla to identify via declaration (a) the location of any such confidential information and trade secrets; (b) any third party to whom O'Neil and/or Escamilla provided such confidential information and trade secrets taken from Odgers or information derived therefrom; and (c) any physical locations (such as computers or drives) or electronic locations (such as servers or other online environments) at which such confidential information and trade secrets were located, transmitted to or used so that Odgers can seek the return of such information;

D. An order that O'Neil and Escamilla breached their duties of loyalty owed to Odgers and awarding compensatory damages, punitive damages, and the disgorgement of all amounts earned by Defendants during periods of disloyalty;

E. An order that O'Neil and Escamilla breached their contracts with Odgers and awarding compensatory damages to Odgers;

F. An order that O'Neil and Escamilla violated the Defend Trade Secrets Act of 2016 and awarding compensatory damages and exemplary damages equal to two times the compensatory damages awarded pursuant to the DTSA and reasonable attorney's fees;

G. An order that O'Neil and Escamilla misappropriated Odgers' confidential information and awarding compensatory and punitive damages; and

H.    Such other and further relief as this Court deems just and equitable.

Dated:   New York, New York
          June 30, 2021

**TARTER KRINSKY & DROGIN LLP**

By: _____
    David N. Kleinmann
    William F. Schmedlin
1350 Broadway, 11th Floor
New York, New York 10018
Tel: (212) 216-8000
Fax: (212) 216-8001
dkleinmann@tarterkrinsky.com
wschmedlin@tarterkrinsky.com

*Attorneys for Plaintiff*
*Odgers Berndtson, LLC*