UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ODGERS BERNDTSON, LLC,

               Plaintiff,

       -against-

JAVIER O'NEIL and VALERIA ESCAMILLA

          Defendants.

Case No.  1:21-cv-05652


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER
<u>AND A PRELIMINARY INJUNCTION</u>**

David N. Kleinmann
William F. Schmedlin
TARTER KRINSKY & DROGIN LLP
1350 Broadway – 11th Floor
New York, New York 10018
(212) 216-8000
dkleinmann@tarterkrinsky.com
wschmedlin@tarterkrinsky.com

*Attorneys for Plaintiff
Odgers Berndtson, LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 5

ARGUMENT .................................................................................................................... 9

I. ODGERS IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A
PRELIMINARY INJUNCTION AGAINST O'NEIL AND ESCAMILLA ............................... 9

A. The Legal Standard to Obtain a Temporary Restraining Order and a Preliminary
Injunction ........................................................................................................... 9

B. Odgers Will Suffer Irreparable Harm in the Absence of Injunctive Relief ...................... 10

C. Odgers Has a Likelihood of Success on the Merits ............................................. 12

   1. Odgers is Likely to Prevail on Its Claim for Breach of the Duties of Loyalty
and Fidelity ...................................................................................................... 13

   2. Odgers is Likely to Prevail on Its Breach of Contract Claims ....................................... 14

   3. Odgers is Likely to Prevail on Its Defend Trade Secrets Act Claim............................. 15

   4. Odgers is Likely to Prevail on Its Claim for Misappropriation of
Confidential Information ..................................................................................... 18

   5. The Balance of Hardship Tips Toward Odgers............................................................ 19

II. ODGERS IS ENTITLED TO EXPEDITED DISCOVERY ....................................................... 20

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2470 Cadillac Resources, Inc. v. DHL Express (USA), Inc.*,
    84 A.D.3d 697, 923 N.Y.S.2d 530 (1st Dep't 2011) ...........................................................18

*Ashland Mgmt. Inc. v Janien*,
    82 N.Y.2d 395, 624 N.E.2d 1007 (N.Y. 1993) ....................................................................15

*Baldeo v. Majeed*,
    150 A.D.3d 942, 55 N.Y.S.3d 340 (2d Dep't 2017) ............................................................18

*Bein v. Heath*,
    47 U.S. 228, 6 How. 228 (1848) ........................................................................................20

*Byrne v. Barrett*,
    268 N.Y. 199 (N.Y. 1935) ..................................................................................................13

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) .................................................................................................10

*Edelman v. Starwood Capital Grp., LLC*,
    70 A.D.3d 246, 892 N.Y.S.2d 37 (1st Dep't 2009) ............................................................18

*Feiger v. Iral Jewelry, Ltd.*,
    41 N.Y.2d 928, 394 N.Y.S.2d 626 (1977) ....................................................................10, 11

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984) .................................................................................................12

*Global Telesystems, Inc. v. KPNQWEST, NV*,
    151 F. Supp. 2d 478 (S.D.N.Y. 2001) ...............................................................................20

*IDG USA, LLC v. Schupp*,
    416 Fed. App'x 86 (2d Cir. 2011) ......................................................................................11

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*,
    69 A.D.3d 802, 893 N.Y.S.2d 237 (2d Dep't 2010) ...........................................................14

*Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*,
    No. 651994/15, 2015 WL 6499525 (Sup. Ct. Oct. 19, 2015) ..............................................19

*Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*,
    No. 17-cv-06761-KPF, 2017 WL 4685113 (S.D.N.Y. Oct. 17, 2017) ..................................10

*Phansalkar v. Andersen Weinroth & Co., L.P.*,
    344 F.3d 184 (2d Cir. 2003)..................................................................10, 13

*Wallack Freight Lines, Inc. v. Next Day Express, Inc.*,
    273 A.D.2d 462, 711 N.Y.S.2d 891 (2d Dep't 2000) ............................13

*Western Elec. Co. v. Brenner*,
    41 N.Y.2d 291, 392 N.Y.S.2d 409 (1977) ...........................................10

## Statutes

18 U.S.C. § 1836...........................................................................................17

18 U.S.C. § 1839......................................................................................15, 17

Fed. R. Civ. Proc. 65(b)(A)..........................................................................10

# PRELIMINARY STATEMENT

Plaintiff Odgers Berndtson, LLC ("Plaintiff" or "Odgers") submits this memorandum of law in support of its Order to Show Cause for a preliminary injunction and application for a temporary restraining order against Javier O'Neil ("O'Neil") and Valeria Escamilla ("Escamilla"; collectively with O'Neil, "Defendants") to stop the disclosure and use, and require the return, of confidential information and trade secrets taken by the Defendants.

Defendants O'Neil and Escamilla resigned from their employment with Odgers on April 16, 2021. Shortly thereafter, they began working for Teneo, a competitor of Odgers. Odgers has since come to discover that O'Neil and Escamilla orchestrated a scheme to take from Odgers tens of thousands of files containing confidential information and trade secrets before their resignations, using an Odgers contractor, Jacob P. Deutsch ("Deutsch"), to download (a) files obtained from seven companies that license data to Odgers and (b) files and programs that constitute the client-facing application providing an interface to Odgers' AI-based OBDynamics™ platform. O'Neil and Escamilla took these actions starting just over two weeks before—and continued until the very day before—they submitted their resignations to Odgers.

Deutsch, having since concluded that O'Neil's and Escamilla's directions were not on behalf of Odgers as they represented, has disclosed to Odgers the instructions given by the Defendants. He has provided Odgers with copies of the communications received from O'Neil and Escamilla and a copy of the data downloaded from Odgers' servers.

These documents and Deutsch's declaration tell a stunning tale of brazen theft by O'Neil and Escamilla of Odgers' confidential information and trade secrets done in a manner intentional designed to evade detection including by blatantly lying to Deutsch so that he thought the download was authorized, providing Deutsch the password for a different vendor so that the

intrusion would look like legitimate access and having Deutsch access an area for which conveniently the access logging function would be turned off. The conduct of both O'Neil and Escamilla is a breach of their duties of loyalty owed to Odgers, breaches of their agreements with Odgers, misappropriation of confidential information and trade secrets under New York law, and a violation of the Defend Trade Secrets Act of 2016 ("DTSA").

In late June of 2021, O'Neil and Escamilla were each asked to return to Odgers its confidential information and trade secrets and take commercially reasonable steps to return the information to Odgers and confirm that they no longer possessed it. Both refused to do so and pretended that the suggestion that they took Odgers confidential information and trade secrets was a fiction based on malice by Odgers. O'Neil called it "baseless, harassing and intimidation." O'Neil averred that any suggestion that he took Odgers information was "based on pure speculation, not facts or evidence." Escamilla claimed that any claim of her breach of contract was "unwarranted and unsupported by the facts" and that she "did not disclose any confidential information or trade secrets" and that Odgers contentions are "completely untrue and baseless" and "seem to be based on retaliation for Ms. Escamilla's resignation." That is to say, when given the opportunity to fix the issues caused by their own wrongdoing without the need to involve the Court, they instead pretended that they did nothing wrong and were victims.

In light of O'Neil's and Escamilla's misappropriation of Odgers' confidential information and trade secrets, Odgers seeks a temporary restraining order and preliminary injunction:

(1)     Prohibiting O'Neil and Escamilla, directly and indirectly, and all those working in concert with them, from possessing, disclosing, and/or using Odgers' trade secrets and confidential information, which is defined as information and/or documents obtained during O'Neil's and/or Escamilla's employment with Odgers and falls

under the terms of the Defendants' February 17, 2020 "Reminder and Acknowledgement of Confidentiality Obligations" agreements (the "O'Neil Confidentiality Agreement" and the "Escamilla Confidentiality Agreement"), including but not limited to information Odgers licensed from third parties and the files alleged to have been taken and copied onto the external drives or for which Dropbox downloads were created as detailed in the declarations submitted herewith and in the Complaint; and

(2)     Ordering O'Neil and Escamilla, directly and indirectly, and all those working in concert with them, to return to Odgers' counsel any and all hard or electronic copies of such confidential information and trade secrets, including those external drives given to O'Neil by Deutsch or for which Dropbox downloads were created by Deutsch for Defendants and any copies or information derived therefrom.

As O'Neil and Escamilla have already started their jobs with Teneo, a competitor of Odgers, and as Odgers has reason to believe that its confidential information and trade secrets have already been used by Defendants for Teneo, Odgers is moving by Order to Show Cause rather than by notice of motion. As these wrongful acts demonstrate a clear and present intent to use that information to advantage O'Neil and Escamilla in their jobs with a competitor of Odgers, Odgers further seeks an immediate TRO requiring that:

(1)     O'Neil and Escamilla, directly or indirectly, and all those working in concert with them, are temporarily restrained and enjoined from possessing, disclosing, and/or using such Odgers' confidential information and trade secrets, including but not limited to information Odgers licensed from third parties and the files alleged to have been taken and copied onto the external drives or for which Dropbox

downloads were created as detailed in the declarations submitted herewith and in the Complaint;

(2)     O'Neil and Escamilla, directly and indirectly, and all those working in concert with them, must return to Odgers' counsel any and all hard or electronic copies of such confidential information and trade secrets, including those external drives given to O'Neil by Deutsch or for which Dropbox downloads were created by Deutsch for Defendants and any copies or information derived therefrom;

(3)     O'Neil and Escamilla, must each identify via declaration within 7 calendar days from this Order (a) the location of any such confidential information and trade secrets; (b) any third party to whom O'Neil and/or Escamilla provided such confidential information and trade secrets taken from Odgers or information derived therefrom; (c) any physical locations (such as computers or drives) or electronic locations (such as servers or other online environments) at which such confidential information and trade secrets were located, transmitted to or used so that Odgers can seek the return of such information.

Odgers also seeks targeted expedited discovery to assist the Court in its determination as to whether a preliminary injunction is warranted, to understand the extent of the Defendants misappropriation, disclosure, and use of such confidential information and trade secrets and to aid Odgers in its efforts to obtain the return of its confidential information and trade secrets from third parties.

As is explained in greater detail below, this relief is targeted and seeks only to prevent O'Neil and Escamilla from possessing, disclosing, and utilizing Odgers' confidential information and trade secrets to which they have no legal right. As explained in greater detailed below, the

targeted relief Odgers seeks is justified by the facts. Odgers is likely to succeed on the merits of its claims against O'Neil and Escamilla as they breached contractual obligations, duties of loyalty and the DTSA; Odgers is clearly subject to irreparable harm in the absence of the relief requested; and the balance of the hardship favors Odgers. Accordingly, Odgers requests that this Court enter a temporary restraining order and expedited discovery requested and, following expedited discovery and the appropriate proceedings, grant Odgers' motion for a preliminary injunction to remedy the intentional and blatant misappropriation of Odgers' confidential information and trade secrets undertaken by the Defendants and prevent further irreparable harm to it.

## STATEMENT OF FACTS

A summary is presented below of the underlying facts set forth in greater detail in the accompanying Declaration of David N. Kleinmann, dated June 30, 2021 ("Kleinmann Decl."), Declaration of Kennon W. Kincaid, dated June 29, 2021 ("Kincaid Decl."), Declaration of Jacob P. Deutsch, dated June 28, 2021 ("Deutsch Decl."), and their attached exhibits.

Odgers is provider of, among other services, executive searches, board searches, executive coaching and development services, industry mapping, interim appointments, and leadership assessment services. Kincaid Decl., ¶ 3. As part of these efforts, Odgers developed OBDynamics™, an intelligent searchable source that, among other things, enables Odgers to (1) build custom analytical maps of skills and talent distributions, compensation variation, career progressions, and pipeline analyses; (2) provide tailored shortlists of ready-to-hire and mid-level candidates to Odgers' clients; and (3) execute traditional executive searches faster, more accurately, with a more diverse population of candidates, and with a greater chance of finding the candidates that no one else can find. Kincaid Decl., ¶ 10.

O'Neil joined Odgers on or about February 15, 2019, as Head of Research and Knowledge Management. Kincaid Decl., ¶ 6. He entered into an offer letter (the "O'Neil Agreement") that included an agreement not to disclose "any information concerning matters affecting or relating to the business of [Odgers.]" Kincaid Decl., ¶ 7, Kincaid Ex. 1. Escamilla had already joined Odgers on or about September 5, 2018, as a Research Associate and pursuant to an offer letter (the "Escamilla Agreement") containing the same language on confidentiality. Kincaid Decl., ¶¶ 8-9; Kincaid Ex. 2. Both also received Odgers' employee handbook, which contains similar constraints regarding preserving the confidentiality of Odgers' information. Kincaid Decl., ¶¶ 44, 45.

Over the course of their employments, both O'Neil and Kincaid were involved in Odgers' launch of its OBDynamics™ capabilities. Kincaid Decl., ¶ 10.

On or about February 17, 2020, O'Neil and Escamilla executed the O'Neil Confidentiality Agreement and Escamilla Confidentiality Agreement wherein they reaffirmed the confidentiality obligations found in their offer letters and agreed that information concerning OBDynamics™ would be treated "as both Confidential Information and Trade Secrets" and that they would "take special care not to discuss this initiative nor any of its aspects or particulars . . . outside of Odgers generally and specifically with any other executive search firms." Kincaid Decl., ¶¶ 11-12, Kincaid Ex. 3, 4. One such initiative was Odgers creation of an application (the "OBDynamics™ Application") which would allow direct client access to certain aspects of the OBDynamics™ platform. Kincaid Decl., ¶ 12.

O'Neil and Escamilla abruptly submitted their resignation letters via electronic mail on April 16, 2021. Kincaid Decl., ¶ 13; Kincaid Decl., Exs. 5, 6. They worked for about a week

thereafter.  Kincaid Decl., ¶ 14.  They shortly thereafter joined Teneo, a competitor of Odgers.

Kincaid Decl., ¶ 15.

<u>O'Neil's and Escamilla's Data Theft</u>

Over the course of approximately their final two weeks at Odgers, before their sudden resignations, O'Neil and Escamilla deceived Deutsch, a provider of services to Odgers on a project-by-project basis, into providing them with a massive download of Odgers' confidential information and trade secrets.  Kincaid Decl., ¶ 16.  Deutsch began providing services to Odgers on or about January 2021.  Deutsch Decl., ¶ 13.  Unbeknownst to Deutsch, O'Neil and Escamilla also asked Deutsch to perform projects for their own benefit under the guise of providing services to Odgers.  Kincaid Decl., ¶ 17.  In relevant part, on April 1, 2021, O'Neil sent Deutsch a message asking him to "discreetly" download certain sets of files to a drive that were "too large," which Deutsch agreed to do.  Deutsch Decl., ¶ 5; Deutsch Ex. 2.  O'Neil asked Deutsch to download certain data files and the OBDynamics™ Application files.  Deutsch Decl., ¶ 6.  On April 5, 2021, O'Neil and Escamilla created a group chat on an encrypted messaging app, Signal, and provided Deutsch credentials to access the relevant portion of Odgers' servers.  Deutsch Decl., ¶ 7; Deutsch Ex. 3.  Deutsch was told the IP logging processes would be turned off, which they were, and asked him to leave a minimal digital footprint.  Deutsch Decl., ¶ 8.  The credentials were for the India-based developer with which Odgers had developed the OBDynamics™ Application not O'Neil or Escamilla.  Deutsch Decl., Ex. 3; Kincaid Decl., ¶ 20.

On April 6, Deutsch confirmed the download of over 1.3 terabytes of data for Defendants.  Deutsch Decl., ¶ 9; Deutsch Ex. 4.

The same day, Escamilla asked if there would be "any use in extracting anything" from a connected "instance", indicating they wanted all the files they needed for "replicat[ing] this app

in a separate environment." Deutsch Decl., ¶ 10; Deutsch Ex. 5. When Deutsch said the active instance would need to be taken offline to do so and advised that there would be a record of taking the active instance offline, O'Neil and Escamilla changed their mind regarding copying the particular instance. Deutsch Decl., ¶ 10.

On April 8, O'Neil confirmed that he still wanted Deutsch to hand deliver to O'Neil's home two physical hard drives containing copies of the data on April 11. Deutsch Decl., ¶ 11. Deutsch so delivered the drives. Deutsch Decl., ¶ 12. Deutsch kept a copy as well. *Id.*

Escamilla asked for one further download to be provided to her and O'Neil on April 15, 2021, the day before they submitted their resignations. Deutsch Decl., ¶ 13; Deutsch Ex. 6. She noted there had been updates to the downloaded files for the OBDynamics™ Application and asked Deutsch to make "sure we backed up the latest version." *Id.* Deutsch provided them a link to a Dropbox containing those files that night. Deutsch Decl., ¶ 14.

It was only weeks later that O'Neil informed Deutsch that he was leaving Odgers to join Teneo. Deutsch Decl., ¶ 18. O'Neil also indicated the downloaded files would be used as a "baseline" for his work at Teneo. Deutsch Decl., ¶ 19. Deutsch subsequently brought O'Neil's and Escamilla's actions to Odgers' attention. Deutsch Decl., ¶ 20.

<u>The Data Stolen by O'Neil and Escamilla</u>

Contrary to the representations of O'Neil and Escamilla, there was no legitimate business purpose behind any of the downloads. Kincaid Decl., ¶ 30. Based on the locations accessed for the download, these files are largely categorized as (a) files obtained from seven companies that license the data to Odgers and (b) files/programs which constitute the OBDynamics™ Application. Kincaid Decl., ¶ 35. Both are subject to confidentiality obligations, are rigorously protected by Odgers, and derive value from the fact that they are so protected. Kincaid Decl., ¶¶

40-42. Public disclosure of the licensed files, which are also subject to additional statutory and contractual confidentiality obligations, would place Odgers at a competitive disadvantage by providing competitors to access to the same unique compilation that Odgers licenses at considerable expense and risks the good faith of clients and customers who depend on such information being kept confidential. Kincaid Decl., ¶ 40. Public disclosure of the OBDynamics™ Application files further allows the competition to recreate the platform Odgers worked to create. Kincaid Decl., ¶ 42.

Odgers, through its counsel, attempted to address the matter directly with O'Neil and Escamilla by demanding the return of the confidential information and trade secrets, the disclosure of to whom the confidential information and trade secrets had been disclosed, and access for a third-party forensic expert to determine all of Odgers' confidential information and trade secrets had been returned. Kleinmann Decl., ¶ 3; Kleinmann Exs. 2, 3. O'Neil and Escamilla did not comply, instead each falsely claiming that the idea that they had taken Odgers confidential information and trade secrets was baseless, resulting in the instant litigation. Kleinmann Decl., ¶¶ 4-5; Exs. 4, 5.

## ARGUMENT

### I. ODGERS IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AGAINST O'NEIL AND ESCAMILLA

#### A. The Legal Standard to Obtain a Temporary Restraining Order and a Preliminary Injunction

The standard to obtain a preliminary injunction is well established:

for the last five decades, this circuit has required a party seeking a preliminary injunction to show "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'"

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)). Likewise, "the standard for an entry of a TRO is the same as for a preliminary injunction." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, No. 17-cv-06761-KPF, 2017 WL 4685113, at *1 (S.D.N.Y. Oct. 17, 2017) (*citing CF 135 Flat LLC v. Triadou SPY N.A.*, No. 15-cv-5345 (AJN), 2016 WL 2349111, at *1 (S.D.N.Y. May 3, 2016)).

This Court may issue a TRO and preliminary injunction to prevent "immediate and irreparable injury, loss or damage [] to the movant." Fed. R. Civ. Proc. 65(b)(A). In addition, the DTSA, the basis for one of Odgers' causes of action, provides that courts may grant an injunction "to prevent any actual or threatened misappropriation [of trade secrets] on such terms as the court deems reasonable." 18 U.S.C. § 1836(b)(3)(A).

**B.      Odgers Will Suffer Irreparable Harm in the Absence of Injunctive Relief**

Defendants' actions during their employment with Odgers breached the duty of loyalty imposed upon them by the common law and made them "faithless servants." *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184 (2d Cir. 2003); *Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 392 N.Y.S.2d 409 (1977); *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 394 N.Y.S.2d 626 (1977).

The faithless servant doctrine provides that an employee is obligated "to be loyal to his employer and is 'prohibited in acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Phansalkar*, 344 F.3d at 200 (quoting *Western Elec.*, 41 N.Y.2d at 295). Unlike traditional breach of fiduciary duty claims, an employer pursuing a claim under the faithless servant doctrine is not required to show that it "suffered . . . provable damage as a result of the

breach of fidelity by the agent." *Feiger*, 41 N.Y.2d at 929. This is of legal significance because there is no need for Odgers to prove damage here in order for the court to enjoin Defendants' breach of their duties of loyalty. Such irreparable harm is presumed from Defendants' theft and plan to use Odgers' trade secrets and confidential information to compete against it. *IDG USA, LLC v. Schupp*, 416 Fed. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm.").

Irreparable harm is also presumed by Defendants' intent to use Odgers' confidential information and trade secrets and therefore disseminate Odgers' such information to Teneo. Escamilla explicitly indicated they wanted to have the files necessary to "replicate this [OBDynamics™] app in a separate environment." Deutsch Decl., ¶ 10; Deutsch Ex. 5. O'Neil told Deutsch he planned to use the downloaded files as a "baseline" at Teneo. Deutsch Decl., ¶ 19. The information that Defendants took is highly sensitive and highly useful to any competitor, as it includes the OBDynamics™ Application, a new software program that Odgers was developing to provide a client interface to the OBDynamics™ platform (Kincaid Decl., ¶ 12), and tens of thousands of files consisting of compilations of data that Defendants, through Teneo, could use to begin to compete with Odgers' OBDynamics™ capacity.

Furthermore, Defendants' conduct strongly suggests they intend to disclose or have already disclosed the information they took to Teneo. Defendants took significant efforts to conceal from Odgers what they were doing. Rather than download documents directly, they deceived Deutsch into downloading thousands of files containing Odgers' trade secrets onto an external hard drive, utilizing their positions as two Odgers employees who had previously given Deutsch projects to give the false impression that Odgers was requesting the downloads, thereby improving his chances of obtaining a permanent job with Odgers. To further cover their tracks,

Defendants (1) provided Deutsch with login credentials to access Odgers' confidential information and trade secrets that were for Ugam, the India-based developer who had worked with Odgers to develop the OBDynamics™ Application, giving an outside viewer the impression that any access and download was performed by an entity with a legitimate reason to access the files (Deutsch Decl., Ex. 3; Kincaid Decl., ¶ 20); and (2) disabled or had disabled the process that logged IP Addresses accessing the folders Deutsch was tasked to copy (Deutsch Decl., ¶ 8). Then when asked to return the information they called the allegation that they had taken Odgers' information baseless.

The "loss of trade secrets cannot be measured in money damages" because "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984). Even without a presumption, Odgers has shown that it will be irreparably harmed absent an injunction preventing Defendants from disclosing Odgers' trade secrets and confidential information. Public disclosure of the OBDynamics™ Application files would allow competitors to recreate the platform Odgers worked to create. Kincaid Decl., ¶ 42. Public disclosure of the licensed files would allow competitors to have access to a compilation of data from several sources which competitors could improve its search services. Kincaid Decl., ¶ 40. The evidence above demonstrates the significant economic value to Odgers of preserving the secrecy of its trade secrets and confidential information. If those trade secrets and confidential information were disclosed, particularly to Teneo, the effect on Odgers' competitive position would be substantial and irreparable.

**C.      Odgers Has a Likelihood of Success on the Merits**

The Complaint sets forth cognizable claims against Defendants for: (i) breach of the duties of loyalty and fidelity; (ii) breach of contract; (iii) violation of the DTSA.; and (iv)

misappropriation of confidential information and trade secrets under New York law.  *See* Kleinmann Decl. Ex. 1.  Odgers has presented evidence that Defendants have taken and not returned confidential information and/or trade secrets.  Having done so, Odgers has demonstrated a strong likelihood of success on the merits on each of its claims.

### 1. Odgers is Likely to Prevail on Its Claim for Breach of the Duties of Loyalty and Fidelity

Given Defendants' purposeful and weeks-long efforts to misappropriate trade secrets and confidential information from Odgers to take with them to a competitor, there is a substantial and well-founded claim against them for breach of his duties of loyalty and fidelity.  "Under New York law, an [employee] is obligated 'to be loyal to his employer and is "prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties."'"  *Phansalkar*, 344 F.3d at 200 (citations omitted); *see also Wallack Freight Lines, Inc. v. Next Day Express, Inc.*, 273 A.D.2d 462, 463, 711 N.Y.S.2d 891 (2d Dep't 2000) ("It is well settled that an employee owes a duty of good faith and loyalty to an employer in the performance of the employee's duties.").  "The duty of an agent or employee not to use confidential information acquired in his employment in competition with his principal is implicit in the relation ... It is an absolute and not a relative duty." *Byrne v. Barrett*, 268 N.Y. 199, 206 (N.Y. 1935)).

The Defendants, beginning at least on April 1, 2021, undertook a coordinated campaign for their own interests and directly counter to Odgers' interests.  They caused Deutsch to provide them with a copy of tens of thousands of files.  Deutsch Ex. 2-4; Kincaid Decl. at ¶ 35.  To ensure that they had stolen everything they felt them would need, they requested an updated download on April 15, 2021, the day before they submitted resignations to Odgers.  Deutsch Decl., ¶ 13; Deutsch Ex. 6; Kincaid Ex. 5-6.  They had no legitimate business reason to request

the downloads or obtain copies of these files.  Kincaid Decl., ¶ 30.  The search for their motivation goes no further than the fact that they joined a competitor of Odgers—with the misappropriated files still in their possession—shortly after their departure.  Kincaid Decl., ¶ 15. O'Neil has even admitted that the files would serve as a "baseline" for his work there.  Deutsch Decl., ¶ 19.

Defendants' conduct before they left Odgers, which was designed to obtain Odgers' trade secrets and confidential information for use in competition against Odgers, breached their duties of loyalty and fidelity and rendered them a faithless servant.  Accordingly, Odgers is likely to prevail on its claim against Defendants for that breach.

### 2.  <u>Odgers is Likely to Prevail on Its Breach of Contract Claims</u>

The evidence already described also demonstrates that Odgers will succeed on its claims that Defendants breached their agreements with Odgers.  The elements of a cause of action for breach of contract are the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damage.  *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2d Dep't 2010).  Here, each Defendant executed an offer letter (the O'Neil Agreement and the Escamilla Agreement) and a subsequent re-affirmation and expansion of their confidentiality obligations (the O'Neil Confidentiality Agreement and the Escamilla Confidentiality Agreement) that obligated them to not disclose to third parties any confidential information or trade secrets and to not retain that information after termination of his employment.  (Kincaid Decl. Exs. 1-4.)  Defendants have breached their contractual obligations under those agreements by intentionally downloading and copying Odgers' trade secrets and confidential information with the apparent intent of aiding Odgers' competitor, Teneo.  Odgers has been and will be severely damaged by any use or disclosure of

trade secrets and confidential information that Defendants have made to date.  Odgers also has pleaded its own performance under each of the Defendants' agreements.  (Kleinmann Decl. Ex. 1, ¶¶ 100, 102, 115, 117.)

Consequently, Odgers is likely to prevail on its breach of contract claims.

### 3.  Odgers is Likely to Prevail on Its Defend Trade Secrets Act Claim

The DTSA provides a third basis for Plaintiff to prevail. The DTSA allows an "owner of a trade secret that is misappropriated," i.e., "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed," to bring a civil action if the "trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. §§ 1836(b)(1), 1839(4).

The DTSA defines "trade secret" broadly to include:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839 (3).[1]

---

[1] Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *Ashland Mgmt. Inc. v Janien*, 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 1012-13 (N.Y. 1993) (citing Restatement of Torts § 757 cmt. (b).

The information in the files and emails that Defendants have taken are trade secrets under the DTSA. As set forth above, the materials Defendants have obtained include highly sensitive software, which is a "financial" and "technical" "information" in the form of a "program" and or "code" and compilations of data, which are "business" "information" in the form of "compilations" that are critical to Odgers' business and provide it with an economic advantage over its competitors. These materials are highly sensitive and confidential in part because a competitor, such as Defendants' new employer, Teneo, could use the information to develop competing software and to use Odgers' compilation of information to create a competitive data environment without the cost incurred by Odgers to license the data, reaping substantial revenues while simultaneously harming Odgers.

Odgers made reasonable efforts to maintain the secrecy of its confidential information. Among other things, it requires all employees—including Defendants—to sign an employment agreement that contains a confidentiality agreement in which each employee agrees not to disclose, among other things, trade secrets and confidential information of Odgers. Kincaid Decl., ¶ 43; Kincaid Decl., Exs. 1, 2. Odgers also had each Defendant sign a reminder of their confidentiality obligations about a year after joining Odgers. Kincaid Decl., Exs. 3, 4. In addition, the site from which Defendants misappropriated Odgers' trade secrets and confidential information requires is password-protected and accessible only to a limited set of users (Kincaid Decl., ¶ 46), and the site also logs the IP address of any user who accesses the site (*see* Deutsch Decl., ¶ 8 (describing that the usually-on IP logging processes were turned off for Deutsch's download for O'Neil and Escamilla)). Indeed, the reasonableness of Odgers' efforts is demonstrated by the lengths to Defendants had to go to gain access, including disabling the IP logging and using credentials belonging to an authorized user. Kincaid Decl., ¶¶ 20-22.

Odgers obtains independent economic value from the information not being generally known. As a licensee of the data, Odgers can sue to recover the data trade secrets. *See* 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action…."); 18 U.S.C. § 1839(4) (defining "owner" of a trade secret as "the person or entity in whom or in which rightful legal or equitable title to, **or license in**, the trade secret is reposed[.]") (emphasis added). Odgers also obtains independent economic value from OBDynamics™ Application not being generally known. Kincaid Decl., ¶ 42.

Defendants, and their employer Teneo, as well as other competitors can obtain economic value from the disclosure or use of the information. The licensing of data and development of the data each cost hundreds of thousands of dollars. Kincaid Decl., ¶ 37. Defendants can benefit from this expenditure by using the stolen information for free. Kincaid Decl., ¶ 40.

Thus, there is no question that the materials Defendants took are trade secrets within the meaning of the DTSA. Similarly, there is no question that Defendants "misappropriated" those trade secrets within the meaning of the DTSA. The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). The term "improper" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other mean." 18 U.S.C. § 1839(6)(A). Here, Defendants had knowledge of the secret nature of Odgers' trade secrets under circumstances that give rise to a duty to maintain their secrecy and limit their use. At a minimum, Defendants violated their duty to maintain secrecy. Defendants also knew that the information is highly valuable, unique, and considered to be trade secrets. Defendants knew this because it was obvious, because of their high-level positions at Odgers, and because of their

agreements with Odgers not to disseminate or disclose trade secrets and other confidential information.  Thus, Defendants knew or had reason to know that they had acquired Odgers' trade secrets by improper means.

Thus, there is a strong likelihood that Odgers will prevail on its claim that the Defendants have misappropriated Odgers' trade secrets in violation of the DTSA.

### 4. Odgers is Likely to Prevail on Its Claim for Misappropriation of Confidential Information

Odgers is also likely to prevail on its common law claim for misappropriation of confidential information against Defendants for the same reasons as it is likely to prevail on its claim for their violations of the Defend Trade Secrets Act.

"To establish a cause of action based on misappropriation of confidential information, the plaintiff must show that . . . the defendant engaged in wrongful conduct, such as physically taking or copying files or using confidential information."  *Baldeo v. Majeed*, 150 A.D.3d 942, 944, 55 N.Y.S.3d 340, 343 (2d Dep't 2017).  The plaintiff also must allege that it "took steps to maintain the secrecy of the information."  *2470 Cadillac Resources, Inc. v. DHL Express (USA), Inc.*, 84 A.D.3d 697, 698, 923 N.Y.S.2d 530, 532 (1st Dep't 2011).

As set forth above, there is ample evidence that Defendants have engaged in wrongful conduct by taking Odgers' files containing trade secrets and confidential information and that they intend to use that information to aid Odgers' competitor, Teneo.  Odgers also took a number of steps to maintain the secrecy of its confidential information, including requiring Defendants to enter into agreements that bound them to keep Odgers' information confidential and not to disclose it.  *See, e.g.*, *Edelman v. Starwood Capital Grp., LLC*, 70 A.D.3d 246, 249, 892 N.Y.S.2d 37, 39-40 (1st Dep't 2009) (an employer takes sufficient steps to maintain the secrecy

of confidential information by requiring an employee to enter into a written confidentiality agreement).

Although a claim for misappropriation of confidential information is broader than a claim for misappropriation of trade secrets, Odgers would be entitled to relief even if it had asserted the narrower claim. *See, e.g.*, *Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*, No. 651994/15, 2015 WL 6499525, at *4-5 (Sup. Ct. Oct. 19, 2015) (examining separate claims for misappropriation of trade secrets and misappropriation of confidential information).

**5.** **The Balance of Hardship Tips Toward Odgers**

In contrast to the irreparable harm that Odgers will suffer if injunctive relief is not granted, Defendants will suffer little or no harm. For now, the injunctive relief requested by Odgers would only prohibit Defendants from using and exploiting the trade secrets and confidential information they obtained from Odgers and require them to return all such information. In other words, the requested injunctive relief merely seeks to ensure that Defendants abide by what they already are legally obligated to do.

Moreover, Defendants' actions to date are the epitome of "unclean hands." O'Neil and Escamilla deceived not just Odgers by misappropriating Odgers' confidential information and trade secrets, but their entire plan relied upon deception and secrecy. They had Deutsch download tens of thousands of files on their behalf by giving the false impression that the request was an official one on behalf of Odgers. Deutsch Decl., ¶¶ 8, 9. They used a third party's credentials to conceal the access. Deutsch Decl., ¶ 8. They turned off or caused to be turned off the IP logging processes to further hide the downloads from others at Odgers. Deutsch Decl., ¶ 9. And they asked Deutsch to leave a "minimal digital footprint" in completing the downloads.

Deutsch Decl., ¶ 8.  These acts are replete with deceit and the use of unfair means to carry out their misappropriation scheme.

It is a long-standing principle of lar that "[t]he equitable powers of this court can never be exerted on behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity." *Bein v. Heath,* 47 U.S. 228, 247, 6 How. 228 (1848).  Accordingly, courts have rejected arguments that the balance of the hardships tilts in favor of a party-to-be-enjoined when they have unclean hands regarding the matter at hand.  *See Global Telesystems, Inc. v. KPNQWEST, NV*, 151 F. Supp. 2d 478, 483 (S.D.N.Y. 2001) (granting a preliminary injunction and finding the balance of hardships "tips decided in favor of [movant]" while considering that "[the defendant] appears before me with, to put it mildly, unclean hands.")

As such, the balance of harms tips sharply in favor of Odgers.

## II.    ODGERS IS ENTITLED TO EXPEDITED DISCOVERY

Odgers further requests, pursuant to Fed. R. Civ. P. Rule 26(d), an opportunity to conduct expedited discovery into the issues that will arise at the preliminary injunction hearing and underlie the irreparable harm alleged by Odgers—Odgers' confidential information and trade secrets taken, disclosed, and/or used by O'Neil and Escamilla.  Expedited discovery is analyzed using the "flexible standard of reasonableness and good cause." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005). When needed in anticipation of a preliminary injunction hearing (or requests for other expedited relief), expedited discovery is granted as a matter of course. *See*, *e.g.*, *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 212 (S.D.N.Y. 2014) (noting the grant of expedited discovery in advance of hearing on preliminary injunction regarding whether there was a violation of restrictive covenant).

As detailed above and in Odgers' accompanying papers, Odgers has good cause to obtain expedited discovery from O'Neil and Escamilla. Odgers' application for a preliminary injunction is premised on the Defendants' taking, using, and/or disclosing Odgers' confidential information and trade secrets. Expedited discovery, and determining the extent of O'Neil's and Escamilla's misappropriation, will allow the Court to have greater evidence to determine the proper outcome of Odgers' request for a preliminary injunction. Odgers' request for expedited discovery is targeted, seeking only copies of any of Odgers' confidential information and trade secrets taken and/or possessed by O'Neil and Escamilla; documents related to the taking, use, and/or disclosure of such confidential information and trade secrets; disclosures and depositions tied to the same taking, disclosure, and/or use; permission to subpoena third parties with relevant knowledge of the taking, disclosure, and/or use of Odgers' confidential information and trade secrets; and the ability to have a third party computer forensic vendor image and review devices or equipment that contained Odgers' confidential information and trade secrets.

There is unique need for robust disclosure by the Defendants here. They have engaged in a course of conduct that may very well transcend civil issues. They took great pains to cover their "tracks." When asked to return this information earlier this week, they lied and said any suggestion of wrongdoing was baseless. Odgers has shown good cause for its request, the Court should grant Odgers' requests for expedited discovery from O'Neil and Escamilla.

**CONCLUSION**

For all of the foregoing reasons, Odgers' application for a temporary restraining order, expedited discovery, and a preliminary injunction should be granted together with such other and further relief as the Court may deem proper.

Dated:   New York, New York
          June 30, 2021

                           **TARTER KRINSKY & DROGIN LLP**

                  By: _____
                       David N. Kleinmann
                       William F. Schmedlin
                  1350 Broadway, 11th Floor
                  New York, New York 10018
                  Tel: (212) 216-8000
                  Fax: (212) 216-8001
                  dkleinmann@tarterkrinsky.com
                  wschmedlin@tarterkrinsky.com

                  *Attorneys for Plaintiff*
                  *Odgers Berndtson, LLC*