UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ODGERS BERNDTSON, LLC,

                Plaintiff,

      -against-

JAVIER O'NEIL and VALERIA ESCAMILLA,

                Defendants.

Case No. 1:21-cv-05652 _____

**DECLARATION OF**
**KENNON W. KINCAID**

      Kennon W. Kincaid declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that:

      1.      I am over eighteen years of age and am competent to testify as to the matters in this declaration.

      2.      I am Chief Operating Officer at plaintiff Odgers Berndtson, LLC ("Odgers"). Odgers has a related company, Idenx Inc. ("Idenx") which is a wholly owned subsidiary.

      3.      Odgers provides executive searches, board searches, executive coaching and development services, industry mapping, interim appointments, leadership assessment services and other related services.

      4.      Odgers provides certain of these services using candidate identification technology which both Odgers and Idenx are involved in. The first use of this capacity was when Odgers, together with the United States Civilian Corps, lead a national response to the COVID-19 crisis. Odgers Berndtson combined its AI-powered talent search platform with a volunteer-led project management capability to rapidly identify healthcare professionals nationwide so that they could be deployed by governments to where they were needed most.

Terms of O'Neil's and Escamilla's Employments

5.  Both Javier O'Neil ("O'Neil") and Valeria Escamilla ("Escamilla") are former employees of Odgers.

6.  On or about February 15, 2019, O'Neil signed and entered into an offer letter with Odgers ("O'Neil Agreement"). Attached hereto as Exhibit 1 is a true and correct copy of the O'Neil Agreement. O'Neil was hired as the Head of Research and Knowledge Management in Odgers Berndtson's New York office, where he was "expected to manage the research needs of the Company" which involved searching for candidates using Odgers' technology and records.

7.  The O'Neil Agreement contained, *inter alia*, a section where O'Neil agreed not to "directly or indirectly divulge, disclose, or communicate to any person, firm or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of [Odgers]" including **"**any other information concerning the business of employer, its manner of operation, or its plans, processes, or other date of any kind, nature, or description without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important."

8.  On or about September 5, 2018, Escamilla signed and entered into an offer letter with Odgers ("Escamilla Agreement"). Attached hereto as Exhibit 2 is a true and correct copy of the Escamilla Agreement. Escamilla was hired as a Research Associate in Odgers' Houston office, where she was "expected to support the research needs and candidate development responsibilities on select assignments." Escamilla eventually transitioned to a role involving the use of technology to manage the research needs of Odgers.

9.  The Escamilla Agreement, like the O'Neil Agreement, contained a section where Escamilla agreed not to "directly or indirectly divulge, disclose, or communicate to any person,

firm or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of [Odgers]" including **"any other information concerning the business of employer, its manner of operation, or its plans, processes, or other date of any kind, nature, or description without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important."**

10. O'Neill and Escamilla were involved in Odgers' launch of its OBDynamics™ capabilities. OBDynamics™ is a powerful intelligence source; among other things, it is designed to enable Odgers to (1) build custom analytical maps of skills and talent distributions, compensation variation, career progressions, and pipeline analyses; (2) provide tailored shortlists of ready-to-hire and mid-level candidates to Odgers' clients; and (3) execute traditional executive searches faster, more accurately, with a more diverse population of candidates, and with a greater chance of finding the candidates that no one else can find.

11. On or about February 17, 2020, O'Neil and Escamilla each willingly signed and entered into a Reminder and Acknowledgement of Confidentiality Obligations (the "O'Neil Confidentiality Agreement" and the "Escamilla Confidentiality Agreement"). Attached hereto as Exhibits 3 and 4 respectively are true and correct copies of the O'Neil Confidentiality Agreement and Escamilla Confidentiality Agreement.

12. Through the Confidentiality Agreements, both O'Neil and Escamilla reaffirmed their existing confidentiality obligations found in their offer letters. Located immediately before their names and signatures was a passage, in capital letters, stating "YOUR SIGNATURE BELOW CONFIRMS YOUR RECEIPT OF AND ACKNOWLEDGEMENT OF YOUR EXISTING CONFIDENTIALITY OBLIGATIONS AND THOSE CONTAINED HEREIN." Furthermore, O'Neil and Escamilla specifically agreed that information concerning the new, AI-enabled

platform would be treated "as both Confidential Information and Trade Secrets" and that they would "take special care not to discuss this initiative nor any of its aspects or particulars including the name of our software/AI partner outside of Odgers generally and specifically with any other executive search firms."  One such initiative was Odgers creation of an application which would allow direct client access to certain aspects of the OBDynamics™ platform ("OBDynamics™ Application").

13. On April 16, 2021, both O'Neil and Escamilla sent via electronic mail resignation letters to Odgers.  Attached hereto as Exhibits 5 and 6 respectively are true and correct copies of the resignation e-mails from O'Neil and Escamilla.

14. O'Neil and Escamilla worked for Odgers for approximately a week after their resignations were submitted.  During this period, I spoke to each of them.  Each stated they were leaving to become independent contractors but would not be working in a competitive space.

15. Shortly after leaving Odgers, both O'Neil and Escamilla joined Teneo working in a competitive capacity meaning their earlier statements about not working in a competitive space were intentionally misleading.

O'Neil's and Escamilla's Scheme to Take Odgers' Confidential Information and Trade Secrets

16. I and Odgers have since come to discover that O'Neil and Escamilla, in the lead up to their departure, orchestrated a massive and intentional misappropriation of Odgers' confidential information and trade secrets.  This was a data theft by now former employees, not a data breach.

17. On or about June 24, 2021, I first met with Jacob P. Deutsch ("Deutsch"), a former provider of service on a project-by-project basis to Odgers, who revealed that O'Neil and Escamilla had also asked Deutsch to perform projects allegedly for Odgers that were, in actuality, for O'Neil and Escamilla themselves.

18. On April 1, 2021, O'Neil asked Deutsch to "discreetly" download a substantial number of files to a drive for him. *See* Deutsch Decl., Ex. 2. This request was approximately <u>two weeks</u> before he resigned and joined Teneo. Escamilla was also involved in this downloading. There was no legitimate business purpose for such a download at that time, nor for the items which were taken and O'Neil's request for the download to be done "discreetly" shows he was already taking steps to conceal the scheme that he and Escamilla were putting into place. Had there been a legitimate business case for their actions, O'Neil and Escamilla would have coordinated with me and others in advance of their actions and the copies of the files would not have been stored at a personal residence.

19. On April 5, 2021, O'Neil and Escamilla established a group message on Signal, an encrypted messaging application, where Escamilla provided login credentials and a password to Deutsch to access Odgers' servers and download the requested files. *See* Deutsch Decl., Ex. 3. This request was <u>eleven days</u> before they submitted their resignations.

20. O'Neil and Escamilla gave Deutsch the login credentials and password for a developer, Ugam Solutions ("Ugam"), that is working with Odgers. *Id.* The only reason one would provide credentials tied to Ugam is to ensure that an unauthorized download, if discovered, would look like a download by a known/authorized developer, Ugam, with a legitimate basis to access the information had done so and would not be tied back to O'Neill and Escamilla.

21. Deutsch has advised that he was also informed that the IP Address logging processes would not be active in the areas he needed to access to conduct the download. *See* Deutsch Decl., ¶ 8. Deutsch advised that those processes were indeed not active when he logged on. *See id.*

22. The fact that the IP Address log was turned off when Deutsch accessed the AWS S3 server means the server would not keep a record of this occurring, effectively turning the security system off.

23. On April 6, 2021, Deutsch confirmed to O'Neil and Escamilla that he had downloaded files totaling over 1.3 terabytes of information to an external drive. *See* Deutsch Decl., Ex. 4.

24. Also on April 6, 2021, Escamilla asked if there would be "any use in extracting anything" from a connected "instance". *See id.* She explicitly explained their motivation in downloading the files for the OBDynamics™ Application and their asking about the instance as "want[ing the files necessary] to replicate this app in a separate environment". *See id.* "Replicat[ing] this app in a separate environment" can only mean being able to build the OBDynamics™ Application outside of Odgers' servers.

25. Escamilla's April 6, 2021 questions and request were a mere ten days before they submitted their resignations to Odgers during a time when there was no need for Odgers to replicate the OBDynamics™ Application outside of the servers on which it was located.

26. O'Neil asked Deutsch on April 8, 2021 how the download had gone. *See* Deutsch Decl., Ex. 5. Deutsch confirmed he had successfully completed the project they gave him. Deutsch asked if O'Neil still wanted him to hand deliver the two drives on April 11, 2021, which O'Neil confirmed.

27. Deutsch explained that, on April 11, 2021, he met with O'Neil at his residence and gave him two SATA external drives, each containing the copied data. *See* Deutsch Decl., ¶ 12. According to Deutsch, O'Neil indicated that one was for Escamilla. *See id.* This meeting was five days before O'Neil and Escamilla submitted their resignations to Odgers.

28. On April 15, 2021, Escamilla contacted Deutsch to inform him that updates had been released for the OBDynamics™ Application he had been asked to copy. *See* Deutsch Decl., Ex. 6. She asked him to log back on using the same credentials and make sure he "backed up the latest version" for O'Neil and Escamilla. This request was <u>one day</u> before they submitted their resignations to Odgers.

29. Deutsch accessed the cloud lake, downloaded the updated OBDynamics™ Application files, and provided them to O'Neil and Escamilla by Dropbox. *See id.*; Deutsch Decl., Ex. 7.

30. For all of these downloads, there was no such request from Odgers, and there was no legitimate business purpose for O'Neil or Escamilla to request these downloads. This was O'Neil and Escamilla misappropriating Odgers' data and programming in an effort to use it in their next employment with Teneo and in competition with Odgers.

31. All employees, at the time of their departures from Odgers, are required to turn over any hardware or files they maintain at that time. At the time of the defendants' departures from Odgers, each returned to Odgers their laptops. Neither left nor returned to Odgers the external drives which they presently possess.

32. On April 22, 2021, Deutsch reached out to O'Neil to ask him about the contract proposal he had made earlier to work with Idenx. *See* Deutsch Decl., Ex. 8. Although O'Neil (and Escamilla) had submitted his resignation to Odgers nearly a week earlier, on April 16, O'Neil did not reveal this to Deutsch at that time. Instead, he pretended he was still affiliated with Odgers and in good standing, and that the delay was administrative because of an "internal power struggle" that he hoped would be resolved shortly. *Id.*

33. Deutsch explained that, ultimately, O'Neil disclosed to Deutsch that he had left to join Teneo. *See* Deutsch Decl., ¶ 18. Deutsch further stated that, at some point in late April or later, O'Neil indicated to Deutsch that the misappropriated files would be used by O'Neil and Escamilla as a "baseline" for competitive work at Teneo. *See* Deutsch Decl., ¶ 19. The use by O'Neil and/or Escamilla of Odgers' files taken as well as their knowledge of Odgers' confidential information and trade secrets would permit O'Neil, Escamilla and Teneo to unfairly compete with Odgers.

The Misappropriated Files

34. On June 25, 2021, Mr. Deutsch gave me the copy of the hard drives provided to O'Neil by Mr. Deutsch. I have spoken with Mr. Deutsch about the downloaded files.

35. Deutsch advised that each hard drive contained 32,570 files. *See* Deutsch Decl., ¶ 9. Based on the locations accessed for the download, these files are largely categorized as (a) files obtained from seven companies that license the data to Odgers and (b) files/programs which constitute the OBDynamics™ Application.

36. Odgers knows the identities of the data providers affected by O'Neil and Escamilla's misappropriation scheme. Odgers has not included their identities in the filings to date in the above-captioned litigation solely to protect them from unwarranted reputational harm arising from O'Neil and Escamilla's actions. Odgers will disclose the identities of these entities to opposing counsel outside of public filings subject to a Confidentiality Stipulation and Order and to the Court, *in camera*, if needed. Indeed, O'Neil and Escamilla having intentionally stolen the data from these sources, certainly know who they are.

37. The compilation of data taken by O'Neil and Escamilla was data that Odgers paid hundreds of thousands of dollars to license and which it used in combination with other data as a unique and non-public data set from which it researched candidates for its business purposes.

38. As explained above, there was never any request by Odgers for this information to be downloaded, nor was there any legitimate business purpose for O'Neil and Escamilla to request and obtain the files days before their resignations and their joining of a competitor of Odgers.

39. There was never a need for O'Neill or Escamilla to possess external drives at their personal residence(s), to recreate the OBDynamics™ Application outside of Odgers' possession nor to possess the data outside of Odgers' systems.

Odgers' Protection of Its Confidential Information and Trade Secrets

40. Odgers places a high priority on maintaining and preserving the confidential nature of its documents and the documents it receives from other sources. For the data it licenses, there are statutory and contractual obligations to keep such information confidential. Documents containing research and personal information are compiled and combined by Odgers to provide Odgers with a unique data set, unavailable to the public at large, that has significant economic value to Odgers because of its confidentiality. Odgers is able to match candidates and clients specifically because of this collection of information. Public disclosure of Odgers' unique compilation of information would place them at a competitive disadvantage.

41. Each of the data sets that O'Neil and Escamilla misappropriated are required by Odgers to be kept confidential pursuant to the license for such data.

42. Odgers rigorously protected the OBDynamics™ Application source code and derives its value because the files comprising the platform are so protected. Public disclosure of the source code and other platform-enabling files would allow any of Odgers' competitors to match

the platform it has created and create a competitive product or service prior to Odgers' launch of its application.

43. Odgers takes significant steps to ensure that its confidential information and trade secrets are protected from unauthorized access and/or disclosure. As seen with O'Neil's and Escamilla's agreements, Odgers includes confidentiality provisions in its employee agreements.

44. Odgers' employee handbook contains multiple sections dealing with treatment of Odgers' information and confidential materials. Odgers states in the handbook that:

> Information relating to the business of Odgers Berndtson LLC and its clients and customers, regardless of the source, is considered confidential and may not be disclose to any person other than those within Odgers Berndtson LLC who have a legitimate need to know. Be careful not to discuss office matters outside the office, even if names are not used. In particular, Odgers Berndtson LLC matters should not be discussed in elevators, restaurants or other public places where you can be heard.

45. With regard to work product, the handbook states that "any appropriation of Odgers Berndtson LLC computer files . . . without proper authorization may result in immediate termination and appropriate legal action."

46. Odgers' computer systems are password-protected—with dual authentication—to limit access to those with permission to do so. In particular, the systems from which the documents were downloaded are themselves accessible only through the use of credentials generated by Odgers, and few people have permissions to generate such credentials. The specific portion of Odgers' servers O'Neil and Escamilla asked Deutsch to "backup"—AWS S3—is similarly protected.

Odgers' Need for Injunctive Relief

47. Odgers seeks this temporary restraining order and preliminary injunction to protect its confidential information and trade secrets as Odgers is at risk of immediate and irreparable harm due to the actions of O'Neil and Escamilla.

48. Deutsch was used and lied to by O'Neil and Escamilla, who were pretending to be simply backing up documents on behalf of Odgers but in reality, created a scheme to steal Odgers' confidential information and trade secrets, take them to Teneo and to use them to compete with Odgers. O'Neil has already stated his intention to use Odgers' confidential information and trade secrets as a "baseline" on behalf of Teneo and Escamilla discussed recreating the OBDynamics™ Application outside of Odgers possession and control.

49. Odgers undertook development of a new client-facing, AI-enabled platform for which Escamilla and O'Neil specifically took the source code. O'Neil and Escamilla specifically indicated they wanted to make sure they had the files necessary to "replicate this app in a separate environment[.]"

50. This means that O'Neil and Escamilla, as of the day before they resigned, intended to recreate the OBDynamics™ Application outside of Odgers' servers. The OBDynamics™ Application was the interface Odgers had developed to allow customers to directly connect to the new client-facing platform. The only reason to take these files—and to plan to recreate the OBDynamics™ Application—would be to enable their new employer, Teneo, to prepare a competitive product and reap the benefits of all the money and effort Odgers had spent developing the OBDynamics™ Application and protecting the confidential information and trade secrets underlying it.

51. Odgers now seeks a preliminary injunction (a) requiring the return of its confidential information and trade secrets taken by the defendants, (b) stopping them from using or disclosing said confidential information and trade secrets and (c) providing additional information about where Odgers confidential information and trade secrets were or are located so that they can take all efforts to obtain the return of such information. As the defendants have already begun working for competitor—and as the defendants' words and actions demonstrate their intent to use Odgers' confidential information and trade secrets on behalf of that competitor—Odgers seeks a temporary restraining order to prevent Odgers from being irreparably harmed pending the resolution of the application for a preliminary injunction.

Dated: New York, New York
       June 29, 2021

_____
Kennon W. Kincaid